IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THELMA YOUNG, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 08 C 5062 |
| v. ) | |
| ) | Magistrate Judge |
| MICHAEL J. ASTRUE, ) | Martin Ashman |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Thelma Young ("Plaintiff") seeks judicial review of a final decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Before the Court is Plaintiff's motion for summary judgment and the Commissioner's cross-motion for summary judgment. The parties have consented to have this Court conduct any and all proceedings in this case, including entry of final judgment. 28 U.S.C. § 636(e); N.D. Ill. R. 73.1(c). For the reasons discussed below, Plaintiff's motion is granted, and the Commissioner's motion is denied.

### I. Procedural History

Plaintiff filed an application for DIB on March 16, 2005, alleging that she became disabled as of April 30, 1999. (R. 59). The Social Security Administration ("SSA") denied the claim initially and again on reconsideration. Plaintiff subsequently filed a request for rehearing,

following which a hearing was held before Administrative Law Judge Dennis Greene ("ALJ") on August 8, 2007. At the hearing, Plaintiff amended her alleged onset date to March 16, 2004. (R. 21). On August 30, 2007, the ALJ denied Plaintiff's request, and she subsequently filed a request for review. After the Appeals Council denied it on July 17, 2008, the ALJ's holding became the Commissioner's final decision. Plaintiff subsequently filed the instant action seeking judicial review of the ALJ's decision on September 4, 2008.

## II. Legal Standard

In order to qualify for DIB, a claimant must demonstrate that he is disabled. An individual is considered to be disabled when he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if he is unable to do his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy. *Id.* Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

A claim of disability is determined under a five-step analysis. *See* 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. First, the SSA considers whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(4)(I). Second, the SSA examines if the physical or mental impairment is severe, medically determinable, and meets the durational requirement. 20 C.F.R. § 404.1520(4)(ii). Third, the SSA compares the impairment to a list of impairments

that are considered conclusively disabling. 20 C.F.R. § 404.1520(4)(iii). If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation proceeds to step four. *Id.* Fourth, the SSA assesses the applicant's ability to engage in past relevant work. 20 C.F.R. § 404.1520(4)(iv). In the final step, the SSA assesses whether the claimant can engage in other work in light of his RFC, age, education and work experience. 20 C.F.R. § 404.1520(4)(v).

Judicial review of the ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court reviews the entire record, but does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Thus, even if reasonable minds could differ whether the Plaintiff is disabled, courts will affirm a decision if the ALJ's decision has adequate support. *Elder*, 529 F.3d at 413 (citing *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)).

### III. Factual Background

Plaintiff was sixty-one years old at the time of the hearing. Her educational history includes two years of full-time community college and a third part-time year. Plaintiff began caring for four children with learning and cognitive disabilities in 1996 and adopted them in

2004.[1] (R. 185). All four children have learning disabilities and were Plaintiff's dependents throughout the time for which she is claiming DIB. (R. 183-84). Plaintiff attended classes part time for approximately six months to learn how to care for her disabled children. (R. 183). At the time of the hearing, she lived with her four dependent children as well as with her thirty-one year old biological son. (R. 190-91).

### A.     Work History

Plaintiff was employed as a transportation supervisor at the Chicago Transit Authority ("CTA") from October 24, 1974 through April 30, 1999. (R. 59, 83). This job required Plaintiff to drive and be active throughout the workday, and occasionally required her to lift and carry bags of salt weighing more than twenty pounds over short distances. (R. 102, 192). For an eight-month period she also held a position as a receptionist, which involved answering the phone but not typing. However, no earnings statements appear in the record related to the receptionist job. After Plaintiff's April 30, 1999 injury, she had been working for the CTA for twenty-five years and was eligible for retirement and a pension, which she took. (R. 194). She has not been employed subsequently. (R. 189-90).

### B.     Medical History

On April 30, 1999, Plaintiff accidentally put her right hand, which is her dominant hand, through a glass window, lacerating her hand and wrist. (R. 144-45). She also sustained other

---

[1] Plaintiff testified that she originally took in five children, but one was later incarcerated. (R. 185).

minor injuries to her left hand. (R. 145). She went to the emergency room at the West Suburban Hospital Medical Center in Oak Park, Illinois, where she received treatment and was released. After the injury, Plaintiff was not permitted to work for the CTA because her injury prevented her from driving, lifting bags of salt, and performing other job-related duties. (R. 200).

On May 7, 1999, Plaintiff saw her treating physician, Dr. Evangelous Georgoulis, whom she had been seeing several times a year since 1997. (R. 149-54). Dr. Georgoulis noted lacerations of her right hand. A follow-up treatment note on June 22 noted weakness in Plaintiff's right hand and indicates that Dr. Georgoulis referred Plaintiff to another doctor. (R. 152). Plaintiff continued to see Dr. Georgoulis periodically through January 5, 2001, though these visit notes do not document any treatment or progress of her hand injuries. On March 30, 2000, Dr. Georgoulis completed an attending physician statement in which he indicated that Plaintiff had been disabled due to her right hand injury from April 30, 1999 until November 1, 1999. (R. 154).

After the January 5, 2001 visit, Dr. Georgoulis' notes suggest that Plaintiff's next appointment was on February 14, 2005. (R. 151). This note, while difficult to decipher, mentions Plaintiff's right hand and appears to indicate a "wasting of the interosseous muscles." (*Id*). The note also indicates a referral to a hand specialist. However, the record does not confirm that Plaintiff followed up on this referral, nor does it contain any other medical documentation from a physician other than Dr. Georgoulis after Plaintiff's initial emergency room treatment.

Plaintiff next saw Dr. Georgoulis on March 14, 2005. On March 16, the day she filed for DIB, her treating physician released her medical records to the SSA. (R. 150). On October 21,

2005, he completed an RFC questionnaire indicating the he had seen Plaintiff "monthly." (R. 158). Dr. Georgoulis also provided a diagnosis of carpal tunnel syndrome with a "poor" prognosis, finding that her right hand had a weak grip that prevented her from lifting even objects weighing less than ten pounds. (R. 164). According to Dr. Georgoulis, Plaintiff could not use her right hand to grasp repetitively, to turn or twist objects, or to reach; she could do so with her left hand only up to 80% during an eight-hour work day. He also indicated that Plaintiff had daily, sharp pain in her right hand, rated as seven on a scale of ten by Plaintiff herself, that was precipitated by movement. She also had an undetermined amount of pain in her left hand. (R. 159). Dr. Georgoulis opined that Plaintiff's condition would cause her to be absent from work more than three times a month if she attempted to perform ordinary job duties. (R. 165).

### C. Plaintiff's Testimony

At the hearing, Plaintiff testified that after her injury the CTA was concerned about the fact that she could no longer drive or perform her other job duties. As a result, she was not allowed to return to work and took retirement after twenty-five years at the CTA. (R. 194). Plaintiff also stated that she worked full-time for an eight month period as a receptionist, which primarily involved answering the telephone. Regarding her injury and its symptoms, she stated that she was unable to close her right hand, which had no strength immediately following her accident. (R. 201). In the time since her injury she claims that she has gained the ability to partially close her hand but that she still lacks grip strength. Her condition has worsened somewhat due to chronic stiffness and discomfort. (R. 201-02). Plaintiff testified to having a

somewhat better grip with her left hand than with her right, but her arm has little strength or capacity for manipulating small objects like cups of coffee. (R. 202).

Plaintiff testified to attending special classes for about six months in order to learn how to care for children with disabilities. (R. 183). She stated that since her injury, she has continued to provide care for her adoptive disabled children personally, though she receives assistance from them with household chores such as laundry. (R. 195-96).

### D. The Medical Expert

Medical expert Dr. Ashok Jilhewar, an internal medicine specialist, also testified at the hearing. Dr. Jilhewar noted that the emergency room records of April 30, 1999 indicated that Plaintiff had a "good range of motion at the [right] wrist and elbow" immediately following treatment for her injury. (R. 144-45, 203-04). Dr. Jilhewar also interpreted Dr. Georgoulis' treatment notes as indicating that Plaintiff's disability due to her hand injury ended on November 1, 1999 and suggested that this was inconsistent with the treating physician's RFC assessment on October 21, 2005.

The ME noted that Dr. Georgoulis had made two "important referrals" for Plaintiff but that the record did not indicate that Plaintiff had seen any other physician. Furthermore, based on Plaintiff's recorded blood pressure, Dr. Jilhewar stated that Plaintiff must have seen a physician other then Dr. Georgoulis for the period of January 5, 2001 through February 14, 2005, a stretch of time in which Dr. Georgoulis' treatment notes do not indicate that Plaintiff visited him. If that was the case, Dr. Jilhewar stated that the ALJ would need to obtain those medical records in order to make his decision. (R. 207). Dr. Jilhewar determined that the

medical record that was provided to him was insufficient to establish that Plaintiff's RFC was reduced by her alleged disability.² (R. 205-08).

### E. The ALJ's Decision

The ALJ issued his decision on August 30, 2007 and denied Plaintiff's application for DIB. The ALJ found that Plaintiff met the insured status requirements on December 31, 2004 – her last date insured. (R. 21). At step one, Plaintiff was found not to have been engaged in significant gainful activity from her onset date of April 30, 1999 through her last date insured. The ALJ determined that Plaintiff's wrist injury was a medically determinable impairment, but he found at step two that it was not severe. Accordingly, the ALJ did not proceed to step three, which determines whether a severe impairment meets or medically equals a listed impairment. *See Stein v. Sullivan*, 892 F.2d 43, 44 n.1 (7th Cir. 1989) ("A negative answer at any point, other than step 3, stops inquiry and leads to a determination that the claimant is not disabled."). The ALJ reached this decision, in part, by determining the limiting effect Plaintiff's wrist injury had on her ability to perform work activities. As part of this process, the ALJ considered Plaintiff's testimony and found it to be non-credible. (R. 24).

### IV. Discussion

Plaintiff argues that the ALJ erred on four grounds. According to Plaintiff, the ALJ: (1) based his decision on an improper inference drawn from a mistake of fact; (2) inadequately

---

² Testimony was also given at the hearing by vocational expert ("VE") Michelle Peters. As neither party bases its arguments on the ALJ's questions to the VE or the VE's testimony itself, the Court does not review that testimony here.

evaluated evidence dated after Plaintiff's last date insured; (3) improperly assessed her credibility; and, (4) failed to order a consultative examination.

### A. The Mistake of Fact

The record contains three pages of treatment notes from Dr. Georgoulis indicating that he treated Plaintiff from 1997-2001 and then again in 2005. The ALJ took no direct notice of these notes or any treatment Plaintiff received from Dr. Georgoulis, though he briefly referred to the two additional reports made by the treating physician dated March 30, 2000 and October 21, 2005. Instead, the ALJ found that Plaintiff failed to show that her condition was severe, in part, because she did not proffer sufficient medical documentation to support her claim. He stated: "Furthermore, claimant has not produced sufficient physicians' medical records for the time period in question. Supposedly they do not exist. If this is so, claimant's right upper extremity cannot be as bad as allowed or, if they do exist, why has the claimant not produced them, especially in light of having the benefit of counsel[?]" (R. 24). Plaintiff argues that this is reversible error because the ALJ based his finding on a mistake of fact and made an improper inference from his mistake.

The Court agrees that the ALJ's statement failed to account for Plaintiff's explanation of the record and drew an improper inference from that oversight. The ALJ failed to take any notice of the fact that Plaintiff attempted to explain the absence of records from Dr. Georgoulis by submitting a November 6, 2006 letter from his medical assistant, Diana Nesbitt. Plaintiff also raised the same issue at the hearing. Ms. Nesbitt explained that Dr. Georgoulis had died in September, 2006 and that "a medical record for Thelma Young has yet to be found." (R. 166).

- 9 -

Ms. Nesbitt did not indicate that such records did not exist, only that they could not be located. Presumably, this included the three pages of treatment notes that had previously been submitted by Dr. Georgoulis himself.[3] Thus, it is unclear what the ALJ meant by supposing that "they do not exist," especially as Dr. Georgoulis' October 21, 2005 RFC assessment clearly stated that he had been seeing Plaintiff on a "monthly" basis. (R. 158). At a minimum, this remark suggests that it was at least possible that records existed for the period between 2001 and 2005 that are not documented in Dr. Georgoulis' treatment notes.

The ALJ, however, appears to have conceived of two different possibilities: either the medical visits which the missing records might have documented never happened, or if they did, Plaintiff simply chose not to submit records for them. These assumptions fail to account for Plaintiff's explanation and, absent further discussion, are insufficient to support a finding that Plaintiff's wrist injury was not as severe as she claimed. Instead of establishing the facts underlying this issue, the ALJ relied on speculation to conclude that the missing records indicated a less than severe condition. "Speculation is, of course, no substitute for evidence, and a decision based on speculation is not supported by medical evidence." *White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1995). Moreover, an ALJ cannot reasonably infer that the "failure to submit medical reports establishes that [a claimant] did not receive any medical treatment during this period," especially when the Plaintiff has provided a reasonable explanation for their absence. *Herron v. Shalala*, 19 F.3d 329, 336 & n.11 (7th Cir. 1994)

---

[3] Neither the parties nor the ALJ explains how the three pages of Dr. Georgoulis' treatment notes were produced and made part of the record. The Court assumes Dr. Georgoulis submitted them himself prior to his death, as the record contains a disclosure authorization form from the physician to the Illinois Department of Human Services dated March 16, 2005.

("Lack of discipline, character, or fortitude in seeking medical treatment is not a defense to a claim for disability benefits.").

The Commissioner argues that it was reasonable for the ALJ to infer from the treatment notes that were part of the record that, based on the skip from 2001 to 2005 in Dr. Georgoulis' notes, Plaintiff did not visit him during that period. This argument fails, however, because the ALJ did not rely on such reasoning in his decision, which does not directly discuss Dr. Georgoulis' treatment notes at all. The Commissioner cannot supply reasons that the ALJ himself failed to provide. *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). The Court is unable to restate the ALJ's own evidentiary basis for reaching his decision because "[n]either the Commissioner nor the court may supply reasons for the ALJ" after the fact. *Baker*, 410 F. Supp.2d at 766; *see also Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) ("[R]egardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ.").

The Commissioner also contends that Plaintiff's argument is based on an "interpretation" of the evidence that is not supported by the record. It is not entirely clear what this argument encompasses, but it misses Plaintiff's essential point – the ALJ failed to take note of why records might have been missing, and he based *his* finding, in part, by interpreting that omission against Plaintiff. The Commissioner further claims that it does not appear that any records are missing because Dr. Georgoulis' treatment notes do not contain entries between 2001 and 2005. Without inquiring into whether that appearance was justified or not, and in light of the letter from Dr. Georgoulis' office, the ALJ could not assume that the three pages before him constituted a

complete picture of her visits.  One possible solution to this conundrum would have been for the

ALJ simply to have asked Plaintiff at the hearing whether she saw her physician in the relevant

time period.  However, he made no inquiry into the matter.  In light of the possibility that other

records existed but could not be located, the ALJ improperly relied on an inference that no

records existed to find that Plaintiff's condition was not severe.  Plaintiff's motion is granted on

this issue.

> B. **The Post-Insured Date**

At the hearing, Plaintiff amended her onset date from April 30, 1999 to March 16, 2004.

The relevant question before the ALJ, therefore, was whether she became disabled between that

date and December 31, 2004, her last insured date.  Although he did not discuss Dr. Georgoulis'

treatment notes, the ALJ made a brief reference to the treating physician's October 21, 2005 RFC

assessment.  The ALJ's notice of the RFC report is less than clear, but he appears to have

rejected it on two grounds: (1) it was issued after Plaintiff's last date insured, and (2) it conflicted

with Dr. Georgoulis' earlier report.  Plaintiff argues that both of the ALJ's reasons are misplaced

and that the ALJ also erred by failing to take account of Dr. Georgoulis' February 14, 2005

treatment note stating that she had a wasting of the interosseous muscles of her right forearm.

This note also post-dated Plaintiff's last insured date.  The Commissioner has presented no

argument on this issue, thereby waiving it.[4]  *See Palmer v. Marion County*, 327 F.3d 588, 597-98

---

[4] In light of the Commissioner's silence, the Court does not fully address Plaintiff's second ground on this issue.  Dr. Georgoulis' 2000 report found that Plaintiff's disability ended on November 1, 1999, and the 2005 RFC assessment went on to state that she had no grip strength as of the date of that later report.  The ALJ did not assign any specific weight to

(continued...)

(7th Cir. 2003) (stating that arguments not presented in response to a motion for summary judgment are waived).

In deciding whether a claimant is disabled, an ALJ must consider all relevant evidence, "including the evidence regarding the plaintiff's condition at present." *Parker*, 597 F.3d at 925; *see also Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984) ("There can be no doubt that medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period."); *Stoxstell v. Bowen*, No. 84 C 7317, 1986 WL 11358, at *2 (N.D. Ill. Oct. 7, 1986). This well-established standard required the ALJ to consider the evidence dated after Plaintiff's last date insured, at least if it was relevant to the severity of her impairment during the period under consideration. The February 14 treatment note post-dated the last insured date by only six weeks, and the RFC assessment by only a few months. Neither document indicates that the injuries and impairments discussed in them occurred during the intervening period; rather, both suggest medical conditions consistent with the wrist injuries noted in medical records prior to the last insured date. Thus, the ALJ was required to consider these items, and Plaintiff's motion is granted on this issue.

---

⁴(...continued)
Dr. Georgoulis' opinion, though he appears to have rejected it out of hand. An ALJ can deny controlling weight to a treating physician's report based on inconsistencies, but he cannot reject it without first weighing it based on the factors provided in 20 C.F.R. § 404.1527. SSR 96-2p. The ALJ's failure to do so is especially striking here, where the determinations in the 2005 report are separated by over five years from Dr. Georgoulis' earlier assessment. *See* SSR 96-2p (explaining that "what at first appeared to be an inconsistency" may be reconciled with other evidence under some circumstances). On remand, the ALJ shall state the weight given to Dr. Georgoulis' opinion and the reasons for it.

### C. The Credibility Determination

Plaintiff next argues that the ALJ erred in finding her testimony not to be credible. The Court reviews an ALJ's credibility decision with deference because "the ALJ is in the best position to determine the credibility of witnesses." *Craft*, 539 F.3d at 678. An ALJ's credibility determination warrants reversal only if it is so lacking in explanation or support that it is "patently wrong." *Elder*, 529 at 413-14. An ALJ should consider the entire case record and give specific reasons for the weight given to an individual's statements. SSR 96-7p. Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received, medication taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). The ALJ cited the requirements of SSR 96-7p, but the reasons he gave for his credibility determination show that the ALJ relied primarily on other factors. In part, these involve the missing medical records discussed above. Given his failure to note that Dr. Georgoulis' office could not locate the records, however, the ALJ's reliance on the missing records to reach an adverse credibility finding is based on an improper inference, as discussed above.

Moreover, the ALJ relied on more than just the missing records from Dr. Georgoulis. The decision refers in the plural to insufficient "physicians' medical records," apparently also indicating the records from the referrals Dr. Georgoulis made for the treatment of Plaintiff's hand. Insofar as the ALJ assumed that the absence of such records indicated that Plaintiff had failed to pursue treatment, he was not entitled under these facts to rely on that belief to find that her subjective complaints were not credible. Social Security Ruling 96-7p provides that an ALJ "*must not* draw any inferences about an individual's symptoms and their functional effects from a

failure to seek or pursue regular treatment without first considering any explanations that the individual may provide . . ." SSR 96-7p (emphasis added). Courts in this Circuit have repeatedly found that an ALJ may not reach an adverse credibility determination based on a failure to seek treatment or to comply with medication regimes without first seeking an explanation from the claimant for his behavior. *See Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003); *Craft*, 539 F.3d at 679; *Ellis v. Barnhart*, 384 F. Supp.2d 1195, 1203 (N.D. Ill. 2005) ("[T]he ALJ could rely on [claimant's] non-compliance as long as he had first considered [her] explanations for her non-compliance."); *Dominguese v. Massanri*, 172 F. Supp.2d 1087, 1097 (E.D. Wis. 2001). Here, the ALJ made no inquiry at the hearing on this issue.

Equally difficult to square with the actual record are the ALJ's inferences concerning Plaintiff's motives as a foster mother. As noted above, Plaintiff adopted four disabled children in 2004. (R. 184). The ALJ concluded that, given the fact that she changed her onset date from April 30, 1999 to March 16, 2004, Plaintiff had a financial motive that was linked, in part, to the care of her children. The ALJ's comment on this topic is exceptionally unclear. He stated: "I believe there is an underlying financial motive in light of the claimant amending her onset date to when she retired and also by the care of five foster children and yet alleging that she cannot work." (R. 24). The first part of this statement appears to base its prejudicial finding on an assumption that Plaintiff changed her onset date to correspond to her retirement date. The opposite is true. The ALJ himself noted that Plaintiff retired from the CTA in 1999. (R. 21). Her original onset date was April 30, 1999, but she amended it to March 16, 2004 – five years later. The Court is unsure if the ALJ misconstrued the record or simply phrased his finding in

cryptic terms, but in either case the Court cannot follow the logic of the ALJ's reasoning, and he failed to build a bridge from the record to his credibility finding. (R. 24). The ALJ also failed to provide any explanation of why altering the onset date to March, 2004 indicated an improper monetary motive when Plaintiff had already had the disabled children for eight years prior to the amended date.

Moreover, after noting that Plaintiff had taken the children in as early as 1996, the ALJ further stated, "I assume there is a money issue here." (R. 23). Like the previous comment, this finding clearly affected the ALJ's credibility determination by implying that Plaintiff had a long-standing penchant for using her children to gain money, both prior to her disability claim and as a direct part of that claim itself. In support, however, the ALJ failed to cite any portion of the record or to give any explanation for either this or the previous conclusion. The Court has found no such evidence, and the Commissioner has not cited any. In fact, Plaintiff specifically testified that none of the children received social security income benefits – evidence that contradicts the ALJ's finding and that went unnoticed in the decision. (R. 183-84).

The ALJ's credibility determination also relied on two alleged inconsistencies in Plaintiff's testimony concerning the care she provided for the children. Plaintiff stated that when she adopted her children, who have learning and cognitive disabilities, she went to school one day a week for six months to learn how to care for them. (R. 183). The ALJ found that Plaintiff claimed that her children could now take care of themselves and that this statement contradicted her testimony that they are disabled. (R. 23). It is entirely unclear what the ALJ based the first half of this finding on. Plaintiff never testified that her children "took care" of themselves in the sense that they were self-sufficient or did not need assistance; she merely stated in her

"Activities of Daily Living Questionnaire" that the children "prepare everything" concerning daily chores and that she completes "with some problems." (R. 114). At the hearing, Plaintiff only testified that her teenage children help with cooking and laundry. (R. 190). The ALJ also failed to establish a basis for the second half of his finding, as he never asked Plaintiff to explain the full extent of her children's various disabilities or the ways in which they limited the children's general activities, either in the past or at the time of the hearing. Accordingly, the Court cannot follow the logic of the ALJ's reasoning on this finding.

The ALJ also found an additional "major inconsistency" between Plaintiff's alleged claim that "she cannot care for the children, who are old enough to care of [sic] themselves" and her testimony that she took classes to learn to care for them. (R. 23). The Commissioner does not address what the ALJ meant by this, and the Court cannot trace either the evidentiary basis or the reasoning of this finding. Plaintiff did not testify at the hearing that she could not care for her children; she stated that they helped her with the laundry and cooking.[5] Even if she had stated what the ALJ ascribes to her, no evidence supports his conclusion that it is at odds with the classes Plaintiff took. The ALJ construed Plaintiff's classes against her, but his only inquiry into the nature of those classes merely asked if they addressed how to "deal" with disabled children. (R. 183). No evidence clarifies what this vague description actually encompassed. In the absence of such evidence, the ground for the ALJ's "major inconsistency" is not discernable. The Court could speculate that the classes involved topics such as physical and emotional care, and may have been a mandated prerequisite for adopting disabled children altogether. But

---

[5] The ALJ did not take note of Plaintiff's testimony concerning her activities of daily living, as required by SSR 96-7p.

speculation by either the Court or the ALJ is improper, and the ALJ's findings of inconsistencies are not supported by the record and are not substantial evidence for finding that Plaintiff was not credible.

For these reasons, the Court finds that substantial evidence does not support the ALJ's credibility finding and that the ALJ did not build a logical bridge from the record to his conclusion on this issue. *See Villano v. Astrue*, 556 F.3d 558, 562-63 (7th Cir. 2009) (finding error when an ALJ fails to build a logical bridge between the evidence and his credibility determination). Plaintiff's motion is granted on this issue.

### D. The Consultative Exam

Finally, Plaintiff claims that in not ordering a consultative examination the ALJ failed to ensure that the record was complete. An ALJ has the basic obligation of ensuring that a full and fair record is presented, even when Plaintiff is represented by counsel. *See Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997); *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994). The regulations make very clear that a consultative examination is *required* when "the evidence that may have been available from your treating or other medical sources cannot be obtained for reasons beyond your control, such as death or noncooperation of a medical source." 20 C.F.R. § 404.1519a(b)(2). Plaintiff argues that the death of her treating physician, and her subsequent inability to obtain her records, fall within this requirement.

The Court agrees with this reasoning. Plaintiff notified the ALJ both before and during the hearing about the difficulty she faced in obtaining her medical records from Dr. Georgoulis. The ALJ failed to discuss this issue in his decision. Instead, he found that the absence of

medical records left "significant questions unanswered" and then used that uncertainty as a ground to find that Plaintiff's impairment was not severe. The Commissioner argues that the ALJ was justified in his finding because Plaintiff also failed to produce records concerning the medical referrals Dr. Georgoulis' made concerning treatment for her hand injury. The ALJ, however, did not inquire as to whether Plaintiff sought treatment or, if she did, why she did not submit the records from the physicians she visited. As noted, the ALJ speculated that "supposedly they do not exist." (R. 24). Without establishing that Plaintiff did not, in fact, seek treatment for her hand, the ALJ had no ground for assuming that the record before him was complete and, as he stated, that she had made the best possible case based on it. *See* Record at 24 ("As such I may presume that the strongest case has been made on her behalf."). Plaintiff's motion is granted on this issue.

## V. Conclusion

For the reasons stated above, Plaintiff's motion for summary judgment [Doc. 21] is granted, and the Commissioner's cross-motion [Doc. 32] is denied. Accordingly, the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

**ENTER ORDER:**

*/s/ Martin C. Ashman*
**MARTIN C. ASHMAN**

**Dated:** October 5, 2011.  United States Magistrate Judge